Ms. Hanson. May it please the court. I'm Jackie Hanson representing Appellant Victoria Eaglin. Ms. Eaglin was fired essentially for being in the wrong place at the wrong time. Unfortunately for her, that place was her assigned workstation and that time was her assigned work shift. The District Court erred in granting summary judgment in this case because to do so it had to resolve a number of credibility questions and other disputed issues of material fact in favor of the movement. Of the many, and of course you're familiar with these because you've read the briefing and the relevant portions of the record, two continue to rise to the top as the primary. They both relate to the McDonnell-Douglas analysis and the first is did Ms. Eaglin meet the fourth prong of that analysis? Did she either show that she was replaced by people outside of her class or did she show that other people outside of her class were treated more favorably than she was? Even if we assumed that you're correct on that, there's still the, maybe you're about to talk about it, there's still the pretext issue, right? That's correct, Your Honor. And that brings me to the second question that comes up repeatedly which is did Eaglin present sufficient evidence that the proffered reason by Texas Children's, and we do acknowledge that they did proffer a legitimate, non-discriminatory reason, did Ms. Eaglin present sufficient evidence for a finder of fact to determine that that reason was pretext, that it was not worthy of credence or that it was either that it was untrue or that it was not the real reason for termination? And now to get to these we have to swim through essentially a sea of disputed evidence supported not by conjecture but by testimony from defendants and witnesses, from documentation and also from the absence of evidence that is very relevant. But before we get there I want to talk about the direct evidence and first of course with the standard of review de novo the court must take, must view all the light, the evidence in the light most favorable to the non-movement, must not resolve credibility issues, must resolve all controversies for the movement, the non-movement. So before I get to the McDonnell-Douglas analysis, there is evidence of direct evidence in this case. Now it is true that Plaintiff is not resting all of her arguments on this, however there is evidence that Ms. Eaglin was told approximately a week before she was terminated by a patient access manager, Sheila Jones, who is at the same level of the person the evidence shows actually did make the decision that they, Texas Children's, wanted to get rid of Eaglin and Ms. Williams and replace them with people who were Hispanic, people outside of her class. One week later, that is exactly what happened. There is also evidence that the prior manager, Kelly Crumley, six months prior, perhaps seven months prior, had said the same thing and had said it repeatedly. Now explain to me why those are not stray remarks under the governing test for stray remarks. There are, this is a little bit more complicated than most direct evidence cases because Sheila Jones is not referring to her own beliefs, she is referring to purportedly the wishes of the higher-ups or the powers that be at Texas Children's. We do not know who they were, but it had been said repeatedly that people, presumably Texas Children's, wanted to get rid of Eaglin and Williams and replace them. So, in order for it to be direct evidence of discrimination, we still would have to find that it is not a stray remark, right? So how does the analysis apply to this Sheila Jones remark that you mentioned? Well, first, obviously we have the four elements, the three are easy to provide. It was related to the protected class, it was made proximate in time to the decision that was made, which was termination. And it was directly related to the decision that was made, which again, termination. So the question is, was Sheila Jones a person who either made the decision, had influence over the decision, or under Palisoda, it's at least probative because she did influence, she had influence over the decision. What evidence is in the record to support this hearsay? There is no evidence. Of course, you didn't take the deposition of the supposed proponent of hiring Hispanics? That's correct. And it wasn't just Ms. Jones, it was multiple people who said it. How many? We have Kelly Crumley, who was the supervisor prior to Ms., it was Kelly Crumley stopped in December of 2014, Sheila Jones for a short period of time, six months, and then we had Danielle Williams come in two weeks before the event that led to the termination. But with regard to Ms. Jones being in a position to either make the decision, or had influence, Ms. Jones... Is Annette Williams the person that is not appealing, who was originally one of the plaintiffs, is she, in her deposition, does she claim that she was not on that bus after she was supposedly clocked in to work? She stated, testified in her deposition, that she didn't recall, she'd never heard that piece of information before, that to her recollection, she was not on the bus that morning, but she wasn't spoken to until quite a bit after the event, she didn't recall. She said she did not remember. She didn't believe that she was on the bus, I apologize. She said that she believed... She claimed that she was on time that morning. No, well, yes, she claimed that she clocked in, and then she immediately took her break to go take her daughter, something that she'd requested from home, her daughter was a patient in the hospital attached by a walkway. Ms. Williams does say that she came in through the, there is a rear set of elevator banks that leads directly to that desk. And that that evidence, the video evidence, was evidently not looked at. And that's her testimony. And if I could wrap up the direct evidence quickly, just in the interest of time, again, Sheila Jones was the same level as Danielle Williams, whom we contend was the person who made the decision, and there's ample evidence of that. Sheila Williams was their most recent supervisor. Ms. Eaglin testifies that when Ms. Jones told her this, she was also telling her to go home and color her hair or don't come back. And so there's significant evidence in the record to show that Ms. Jones did have disciplinary power over Ms. Eaglin. She's the one who interviewed Ms. Eaglin in association with the allegations against her, and she reported to the court. She's not the one that terminated Ms. Eaglin. Eaglin. That is correct. That was Mr. Gonzales. We believe the evidence shows that it was actually Danielle Williams. At best, Mr. Gonzales was a rubber stamp on this. He perhaps was. Are you claiming a cat's paw theory? Not exactly. I don't see that in your brief. It's not cat's paw in that we agree with defendant that both Gonzales and Williams would have been of the same mind with regard to we need to replace the women at the cardiology desk with Hispanic employees. The question is simply who was performing that act? Who felled the ax, essentially, that let these women go? Who what? Who made that decision? Who seized upon the opportunity to get rid of these people that they'd wanted to get rid of for a while, essentially? Williams was the person who was most instrumental. Danielle Williams was the person who was most instrumental in this. She performed the investigation. She's also the one who said that she reviewed all of the documents. She performed the ECR. She also says that she made her decision to recommend termination to Gonzales before she ever met with him. Now, is any of that evidence that she is the decision maker, though? I mean, that sounds like evidence that she had input into an ultimate decision by another person. But is that sufficient to show that she, Dee Williams, is the decision maker for purposes of termination? I apologize. We do have additional evidence with regard to Danielle Williams as the decision maker. As defendant pointed out, in Morris v. Overnight Trucking, Judge Atlas said that if there's a dispute between the EEOC statement and the testimony later provided by the defendant with regard to the decision maker, that can create a material issue of fact. And in this case, in the EEOC statement, Annette Williams' EEOC statement, which was presented approximately three weeks before Eaglin's, they're largely similar. This statement only appears in Williams. And I can get you that site. I believe it's 1134. The Texas Children's Hospital says that, as one of their defenses to this, that Annette Williams fails to state that Danielle Williams is of the same protected class, and she does not give any reason why Danielle Williams would discriminate against her. There's no mention in the entire EEOC statement of Gonzales. Everything references Danielle Williams. Some about Tamika Jones. There's a statement in the EEOC statement that references Dee Williams as the decision It does not explicitly say she is the decision maker. However, I failed to see how that creates a conflict in the evidence with respect to who the decision maker is. Well, the implication that I have taken from this is that defendant is trying to rebut any inference of discrimination by saying, no, the decision maker was in the same class. They've also made that argument in their brief. And so to make that, then they have to essentially identify Dee Williams as the decision maker. And while in their brief, they do it in the alternative, in their EEOC statement, that's the only person they come close to identifying. And it's, it's, Did you give us, did you give us the record side to the EEOC statement? I'm sure it's in your brief. And I believe it's 1136. And I will confirm that. And I want to move on to the replacement issue, if I may. Well, if we, to continue on with, with pretext, all of these, another point is that all of these issues regarding credibility for Texas children's all kind of go together. So for example, when we're arguing that they're hiding who replaced these people or hiding the fact that they were replaced, or that they're obscuring who the actual decision maker is, all this goes into the question of, is this all worthy of belief? So those all go into the pretext issue. But in addition are the documents that I've put in front of you, or that I've handed, which are just record excerpts of the key documents that defendants says it relied upon in the termination of Eaglin. Now Judge Hoyt, when he made his, when he entered his order for defendants, assumed that Gonzales was the decision maker. And he also stated that plaintiffs had failed to rebut the time records or the parking records or the video stills. Well, as you can see, those are presented to you in exactly the form that we presented them to the, to Judge Hoyt, to the district court. And what we've shown there is that the time records actually show that all of the activities of the day in question, and the parking records show the same thing, were very much in keeping with the way that things frequently happened. And Nett Williams explained that she clocked in before her parking card was used because her husband worked in the same area, dropped her off, and he actually did it pretty frequently. And the records before you show that that is the case. She clocked in either before or within minutes of the parking card being used a number of times within the very small sample that we have. The same with regard to the clocking records. Defendant keeps saying that Eaglin was logged into that computer at the time that Williams logged in. But actually, the email, which I believe is the second email, the first email that you to determine even where Williams logged in. They believe it was in the West Tower on the 20th floor. Now Williams doesn't deny. She's the one who offered the information that she clocked in at Eaglin's computer. Eaglin didn't deny that. They simply denied that Eaglin clocked her in. Also if you look at that same document, both Anthea Glenn and Annette Williams clocked in on Eaglin's computer all the time. Eaglin got in at 6 o'clock in the morning and her computer was always up and running. Tameka Jones testified there was no problem with this. She herself clocked in to wherever she was closest when she started her shift. She knew, Tameka Jones, knew of no policy which stated that you couldn't log in on alternate computers. So looking and finally, if you look at the image that's provided in the video still, there's no clock in the background. There's no time stamp. There's not even a date stamp on that document. So everyone is looking at this document and saying this is the smoking gun, but that could have been taken any time, any day during which Eaglin was working. And as a result, looking at those documents together, and Danielle Williams states that when she was making her recommendation of termination, the documentation was what she looked at. She stated that yes, Eaglin denied that she had clocked Williams in, but the documentation was all she was looking at. You have what she was looking at in front of you. And only a person who had already made that decision could find that evidence sufficient enough to terminate the employment of a seven-year employee. And so this brings us... Where is the discriminatory act other than this direct evidence you claim? So Plaintiff's prima facie case, which she, with regard to the replacements, and that's briefed, and I will perhaps talk about that. Prima facie case, let's talk pretext. What is the discriminatory act? The discriminatory act is the termination. Okay. What's the discriminatory reason for the termination? The discriminatory reason was that they wanted to place one or more Hispanic workers at that desk. They terminated Victoria Eaglin and Annette Williams, and they did replace them with at least one Hispanic employee. We don't... Obviously, we do not have to prove why they did that. We have to prove that it was why they wanted someone of a different race. We have to prove that that was the animus, obviously discriminatory animus. But as Reeves v. Sanderson and other cases have held, a prima facie case plus the evidence of pretext is sufficient to show that the defendant is dissembling to conceal a discriminatory motive. In this case, we believe that's what's been done. May it please the Court, my name is Ruthie White, and I represent the appellee in this case. I, along with my colleague, Michael Lombardino, are here to address the issues. I will discuss the issues in regards to whether there was insufficient evidence as it relates to pretext, and Mr. Lombardino, if the Court will allow, will discuss the issue in regards to the motion to compel. Could you start with your counsel opposite began with the idea that there is actually direct evidence of discrimination here. She mentioned some comments by S. Jones and Crumley, I think the second one was. Could you address whether that is direct evidence? I think the record is clear. There was a comment made by a supervisor in 2014, Kelly Crumley, that they want Hispanics at the front desk. No one knows who they are. We do know they are not the decision makers in this case. There was an interim. The Crumley comment, is that the one you are talking about right now? There is two that the appellant allows and says is discriminatory and direct evidence. When was the Crumley comment? 2014. 2014. Termination decision was when now? 2015. Okay. What about the S. Jones? I thought there was one that. Sheila Jones was an interim supervisor at the beginning of 2015. Which one was allegedly made near the termination decision? The only testimony in this case is appellant that she was told that comment. There is no evidence in this case that Sheila Jones made that comment at all. I think the judges appropriately addressed the issue that there was no deposition taken of her nor was there deposition requested. Sheila Jones, according to Annette Williams in her deposition testimony, the clinic was complaining because they were too slow getting the patients back to the doctors. They said the reason was they were interpreting Spanish and they had to call and get an interpreter because they could not speak Spanish. Sheila Jones at that time says, well, you need to mind your P's and Q's because they want to get a Spanish at the front door. Even in that context, they were not the supervisors in this case or anyone in the reporting hierarchy to the appellant. That's the comment. Sheila Jones was an interim supervisor. At the time of the termination, the supervisor was Daniel Williams. And this termination had nothing to do with removing Hispanics. There's no evidence other than this comment. This termination has to do with evidence. And, of course, appellant refers to being favorable to the Dunn movement. But this court has said and has long established that if there's an actual controversy. In this case, there's no evidence that Daniel Williams ever made a comment about bringing in Hispanics. No evidence that Enrique Gonzalez talked about getting rid of them and replacing them with Hispanics. The reason this becomes an issue is the appellant in this case testified, I did not file this lawsuit because I thought Enrique Gonzalez did anything wrong. That's why we're trying to figure out and have this argument about a decision maker. Enrique Gonzalez in his deposition testimony said, I made the decision to terminate Ms. Eaglin, the appellant. On the decision maker issue, we were talking about where there is evidence that could create a fact issue as to whether Dee Williams was the decision maker, and I was directed to the, I probably got the terminology wrong, but the EEOC letter. And I will tell the court. And I'm looking at it right now, so what's your response to that? For the first time in appellant's reply, she brought up the issue of the EEOC statement. So I will tell, I will ask the court to consider that the evidence and the record in this case is what was before the district court when he granted the summary judgment. This is the first, wasn't even argued, your honor. The first time is in the appellant's reply. Yes, your honor. What about the merits of it? The merits of it, they didn't say who the decision maker was. They talked about Danielle's investigation, and then they said the two employees were terminated. There wasn't a decision about, or a statement made about Enrique Gonzalez, and I think it was addressed because the charge talked about Danielle Williams. And so in response to the charge alleging that Danielle Williams discriminated against them, the position statement addressed the allegation of Danielle Williams. The evidence in this case, of course, is very clear that Enrique Gonzalez made the termination decision. There's no evidence that he did not, other than appellant's theory that it must be Danielle Williams. Again, if it was Danielle Williams, the same evidence that Mr. Gonzalez considered is the same evidence that Danielle Williams considered. I think this whole issue about who made the decision is primarily because the appellant in this case testified, I didn't file this suit at all, about anything that Enrique did. So it's in the record. It's in her deposition. And so this diversion is basically based on appellant's arguments. There are no facts in the record. Let's talk about the pretext in this case, which I think Judge Hoyt assumed that a prima facie case had already been established, and so he did say a couple things. In his opinion, he said that the comments in this case are not indicative of racial animus, and even if they were, they weren't by the decision maker. That's a fact in this case, and there's nothing that disputes that. Additionally, the one that Sheila Jones, who they said did make an influence on Mr. Enrique Gonzalez, he testified, I did not consult or ask Ms. Jones about the termination. Danielle Williams testified, I did not consult or ask Ms. Jones about the termination. Ms. Jones' only involvement in this case is that when Danielle Williams went to interview Annette Williams, she wanted someone to interview the appellant at the same time, so they wouldn't get together and confer. She asked Ms. Jones, will you interview her while I'm interviewing Annette Williams? And the only thing Ms. Jones did, according to the record, is she came back to Danielle Williams and said the appellant denies that she did it. It's ironic that the appellant believes that Ms. Jones' comment is somehow influencing the decision maker, given the comments in this case say that she was warning her to keep her job. So bottom line is, Danielle Williams investigated it, Mr. Gonzalez independently looked at the documentation, and the record is very clear. In his deposition, he said, I looked at the records that I received from Danielle Williams, I looked at what I received from security, and we had these IP documents. I'd like to address, if I may, if the court will look at the first document. Appellant in her brief seems to believe that you should totally ignore, you know, that this not available is somehow indicative of you don't know who was on the computer at the time. It's important here, her brief only mentions the kiosk, but at the top of 11 of 59, what the IT person is saying that what non-available means is that we don't know exactly who logged her in and clocked her in. Because the server may not have caught who that person is, it may have been on the kiosk where you don't need to have an ID to get in on it, or it could be something that happened where we just couldn't figure out and pick out who it is. What's important is, in the next document, well, I point you to document three, in the record 1163. What's important in that document is in the right-hand column gives you an IP address. That IP address tells you what computer was used. That IP address 10.20.67.179 belongs to Veronica Eaglin, the appellant. The person who's being clocked in, as you notice to the left, is Annette Williams. And, in fact, appellant used this document in their brief to say it wasn't unusual for Ms. Williams to log in on the appellant's computer because she's done it all these times. The same argument could be Veronica Eaglin's logging you in all this time because you were tardy and received a disciplinary record in January 2023 of 16 tardies. What's not in this document, and I'd like to point the court to it, is another document that shows where Ms. Eaglin was being logged in. And let me give you a record cite on that. Okay, and it's the record 574 when you're talking about Ms. Williams' report. And it basically says that the IP address she logged in, just as this document shows you that's before you, ended in 179. That's Ms. Eaglin's computer. If you look in the record at 574, you'll also see, along with Ms. Williams' testimony, that I logged in at noon on that day on my computer. And in 574, you see her IP address is the same as the last column to the right, but it ends in 195. And so looking at that document and Mr. Gonzalez's testimony, he's basically saying Ms. Jones, and there's no evidence in this case that she is discriminatory animus at all, saw you on the shuttle that takes you from the parking garage to the hospital. She saw you between 7.50 and 8 o'clock, which seems appropriate since the parking garage said your car came in at 7.41. If you look at the next document in this case, there's a lot of fodder about we don't know what these deposits, I mean these photos show because there's no date and time on them. If you look at Mrs. Exhibit 2 and the demonstrably record 1162, at the top you can tell they're at 8 a.m. on June 12, 2015. The pictures don't have a date on them, but if you look at the bottom where security is giving their response, he says, I see her entering West Tower 20 from the elevator at approximately 8 o'clock. So the pictures don't have a date on them, but here's security saying I viewed the video  She goes directly to, I'm sorry I'm running out of time, if the court will allow me just to finish this paragraph, may I do so? At the end of the paragraph, it talks about there was an unknown female at that desk since 7 a.m. that morning, and that's appellant. So when security viewed the video, no one was at that desk but Evelyn from 7 to 8 working, and then Annette Williams comes in the elevator at 8 a.m., which is about 10 minutes or so after Ms. Jones saw her on the show.  May it please the court and counsel, there are at least four reasons why this court should affirm the district court's denial of Mrs. Evelyn's motion to compel. Number one, Mrs. Evelyn filed her motion to compel after Discovery had closed, after the motion's deadline, and after Texas Children's had already filed its summary judgment motion. And under this court's opinion in McCollum v. Puckett, which is a case cited in the briefing, the same exact situation was in that case, in that this court affirmed the district court's denial of the motion to compel filed after those three events. The second reason, Mrs. Evelyn had ample opportunity to obtain Discovery during the Discovery period. If she felt like she was not getting the Discovery she needed or the information she needed, it was her responsibility to go to the district court or to file a motion in order to get whatever information she thinks she needs. Under Days In Worldwide, which is also cited in the brief, it says when a litigant fails to seek relief from the district court, they do so at their own peril. The third reason is after reviewing Texas Children's summary judgment motion, Mrs. Evelyn apparently determined that she did not have enough evidence to respond. But the proper procedure in that scenario would have been to file a motion for continuance under Rule 56D. However, the motion to compel clearly states that it is under Rule 37, and that's record site 690. Number four is in Mrs. Evelyn's brief, she fails to identify the specific discovery requests that she concludes the district court should have compelled. All she does is generically discuss information that may exist and or that may be relevant. Under Ledet versus Catalyst Tech, she's therefore waived this issue by not briefing it adequately. Now, I'm not going to actually go through all the arguments that the appellant makes in the briefing, but I would like to address two or three that it's possible she might bring up on rebuttal. One is the scheduling order issue. In the papers, there's the impression that a defense counsel surreptitiously filed a motion to continue and change the dates in there, but I would just like to point out for the court that the continuance motion was a joint motion. And record site 1373, August 19, 2018, plaintiff's counsel reviewed the joint motion and gave a defense counsel permission to use her electronic signature. And one other possible point that might be brought up is difficulty in scheduling the depositions and that Texas Children's produced witnesses at the very end of the discovery that put the other side in a real lurch. But as the record is clear, all depositions were scheduled and noticed in early August 2018, which was within the original discovery period. But just two weeks before the depositions, on July 25, 2018, Mrs. Ziegland's counsel abruptly told us that she needed to reschedule all depositions. At that point, that's when it became apparent that an extension was needed. The joint motion was filed. The same day that the joint motion was filed to continue, Texas Children's started asking for more deposition dates, asking for deposition dates. Again, those sites are in the briefing. One other point is that Mrs. Ziegland could have filed a motion to extend discovery within discovery period. She could have filed a motion to compel while in discovery period. She did neither. And that's about all I have right now, but I will yield my time unless there's any questions for the court. Okay. I'd like to briefly address the motion to compel. I won't go over all the details. It's briefed relatively fully. I absolutely confess to a failure of imagination. I would ask that you review the emails that are cited in the record with regard to the events of October. I'd also like to point out to the court that while I did ask to reset the depositions. What do you mean by you confess to a failure of imagination? Based on the emails from September 14th when plaintiffs sent the second request for production, that's the first time that this relatively large firm said that they missed emails. October 5th, I sent a deficiency letter and counsel didn't see that email. October 19th, I asked for a conference. October 22nd, I asked for a conference. October 24th, I finally got one. It was promised answers. 1133 on October 29th, the day before this non-dispositive motion deadline, I get a letter saying basically you're getting bupkis. I have not experienced that, that we are not getting anything from them essentially. I've not experienced that before. It was naivete on my part. Largely, I'm comfortable with moving forward in trial without documents if they're going to have a difficult time explaining their absence. But based on the affidavits provided by Camp and Gonzales, in this case I fully expect their memories to fully come to life. So because of that, we're not asking the court to rule on the discrete portions of the motion to compel, but merely to remit it to the district court for consideration. Also very briefly, Eaglin did state that if Gonzales had any involvement in her termination, she did believe that he discriminated against her and that's the record at page 995. There's no question that Annette Williams signed into Victoria Eaglin's computer. The question is, to the extent that it's relevant, was Victoria Eaglin signed into the computer at that same time? But since there was no prohibition in signing on someone else's computer, that really is a moot point, but it does demonstrate the evidence here. With regard to the video evidence, again this more goes to Williams, but the documents say what they say. There's no evidence that anyone looked at that desk at 732 and can tell us exactly who was doing what. And with regard to the replacements, again this does go back to the prima facie case. Before I do that though, I am running out of time, I do want to go, Judge Barksdale, to your question with regard to kind of what does show pretext. And I have a bit of a list that we rely on that we believe makes, would lead a fact finder to determine that the defendant's proffered reason is not worthy of credence, is false or not worthy of credence. First of all, and as I said, these all kind of go together. We have the very conflicting evidence with regard to who is the decision maker. We have Danielle Williams saying that it was her, Gonzalez saying, having a difficult time in his deposition, as we pointed out in our brief, of even explaining why he made the decision to terminate. We have the contradictions regarding the replacements and we've briefed that. We have evidence that non-African American employees did replace both Eaglin and Williams, or at the very least Eaglin. The lack of progressive discipline despite Texas children's progressive discipline policy. The evidence in front of you consists of the only evidence that there is with regard to the actual allegation against Eaglin. Again, Tamika Jones, in its briefing, Texas Children's just says, as best as Tamika Jones could tell, Eaglin was the only one who could do it. And because of that, they terminated her after seven years of employment. She had a virtually spotless employment history. We didn't get her performance reviews. Defendant did not produce those. But the only disciplinary action that she had in seven years. Did you move to compel production of the performance reviews? We asked for the full employment files. Did you move for that and you didn't get them? I would have to look at that, Your Honor. I would have to look at that in the motion. I cannot tell you for sure, but I can imagine that I did not. But I don't want to represent to you that I did without putting my eyes on it. And the only disciplinary action was that January 2016 attendance issue. And then finally, the statements, even if they are not direct evidence, are probative under Palisoda because Ms. Jones was involved in the investigation. She did confer with Ms. Williams and she was their most recent interim supervisor. And for those reasons, we believe, coupled with the questions about replacement and the issues with regard to comparators and Texas Children's refusal to produce anyone else who was terminated for the same reasons, we believe that there is sufficient evidence for a fact finder to find the plaintiff. Thank you. Thank you, counsel.